Buffey Klein (TX Bar 24032515 )
HUSCH BLACKWELL LLP
1900 N. Pearl Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 999-6100
Facsimile: (214) 999-6170
Email: buffey.klein@huschblackwell.com

Caleb T. Holzaepfel
(admitted *pro hac vice*)
HUSCH BLACKWELL LLP
736 Georgia Avenue, Suite 300
Chattanooga, TN 37402
Telephone: (423) 266-5500
Facsimile: (423) 266-5499
Email: caleb.holzaepfel@huschblackwell.com

*Proposed Counsel for the Official Committee*
*Of Unsecured Creditors for Electrotek Corporation*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Electrotek, Inc., | ) | Case No. 21-30409-mvl-11 |
| | ) | |
| Debtor. | ) | |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ELECTROTEK, INC.TO CONFIRMATION OF CHAPTER 11 PLAN FOR ELECTROTEK, INC.

The Official Committee of Unsecured Creditors of Electrotek, Inc. (the "Committee")

objects (the "Objection") to the confirmation of Debtor's Original Chapter 11 Plan of

Reorganization dated April 26, 2021 [Dkt. No. 27] (the "Plan") and states as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PRELIMINARY STATEMENT

Electrotek Corporation's (the "Debtor") bankruptcy case and Plan are in complete disarray.

The Debtor has not filed first day motions of any kind – and, upon information and belief, has been

operating and making distributions without authorization of the Court since that time.  The legal fallout of Debtor's negligence and failure to comply with the requirement of Chapter 11 of the Bankruptcy Code will need to be addressed by this Court.

In the absence of a Committee or intervention, Debtor attempted to shove through a Chapter 11 Plan of Reorganization based on misleading and inaccurate Schedules and Disclosure Statements – a Plan that benefits only ownership to the detriment of the Debtor's unsecured creditors.  The Committee has been unable to verify $8.4 Million of the $9.5 Million in alleged secured debt in this case.  The Committee has uncovered millions of dollars in likely unscheduled unsecured claims related to Paycheck Protection Program loans taken by Debtor.  The Committee has uncovered the improper scheduling of priority wage claims that were previously paid.  The Committee has uncovered $3.5 Million in preference period transfers to which no claim was scheduled by Debtor, and to which no value was attributed thereto in the Plan – including a $1 Million transfer to ownership.  And this may only be the tip of the iceberg, as Debtor has failed to produce broad categories of requested documents to the Committee as of the date of this Objection.

The Plan seeks to restore equity interests in ownership with no contribution, provide ownership with interest on alleged secured claims for which Debtor has been unable to provide any financial backup, while paying unsecured creditors only a ten percent (10%) pro rata distribution.  As discussed below, the Plan fails the best interests of creditors test, violates the absolute priority rule, was not solicited to an unsecured creditor with a $2.5+ Million claim, appears to treat like classes disparately, does not provide value to Chapter 5 causes of action, among other issues.  This Court should deny the Plan as it fails under law and equity – as the Court,

HB: 4825-9697-7655.5

this Committee, and possibly a Court-appointed trustee,[1] attempt to unwind the harm executed upon creditors by this Debtor.

## BACKGROUND

3.      On March 8, 2021 (the "Petition Date"), Electrotek, Inc. (the "Debtor"), as debtor and debtor-in-possession in the above-referenced Chapter 11 case (the "Bankruptcy Case"), filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code, designated the Bankruptcy Case under Subchapter V.

4.      Since the Petition Date, upon information and belief, the Debtor continues to manage and operate their businesses as debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

5.      Debtor amended its Voluntary Chapter 11 Petition on April 15, 2021 to remove the Subchapter V designation.

6.      On July 8, 2021, the United States Trustee for the Northern District of Texas (the "UST") organized and appointed the Committee, which was subsequently amended on July 27, 2021, to consist of the following members: (i) Sid Grinker Restoration, Inc.; (ii) Taiyo America, Inc.; (iii) Uyemura International Corp., and (iv) Hagen Decorators Inc.  Jeff Oscarson, CFO of Sid Grinker Restoration, Inc., was selected by the Committee as the Chair of the Committee.

7.      On July 13, 2021, the Committee selected, subject to the Court's approval, Husch Blackwell LLP ("Husch") as its counsel.

***Debtor's Schedules and Statement of Financial Affairs.***

8.      The Debtor filed its *Schedules A/B and D-H* [Dkt. No. 21] and its *Statement of*

---

[1] A review is underway to determine if the Committee will move this Court to appoint a Chapter 11 Trustee under 11 U.S.C. § 1104.

*Financial Affairs* [Dkt. No. 22] on March 29, 2021.

9.  In its Schedule D, Debtor asserts that its thirty (30%) equity owner and Chief Executive Office, Dhirajal Barbaria (the "Owner"), holds a senior secured interest in the amount of $9.5 Million in all of Debtor's assets (the "Alleged Secured Claim"). *See* Schedule D, 2.1–2.3.

10.  In its Schedule A, Debtor asserts that it holds a "Receivable from Owner. Funds transferred to company on 3/29/2021" valued at $700,000.00.  *See* Schedule A/B, Part 11, 77.

11.  Debtor's Schedule E/F asserts priority wage claims as to employees in the total amounts of $288,326.20 (the "Priority Wage Claim"). *See* Schedule E/F, Part 1, 2.1–2.2.

12.  Debtor's Statement of Financial Affairs asserts over $2.3 Million in preference period transfers (the "Avoidable Transfers"). *See* Statement of Financial Affairs, Part 2, 3.1, *et al*.

***Debtor's Plan and Disclosure Statement.***

13.  On April 26, 2021, Debtor filed its Disclosure Statement [Dkt. No. 28] (the "Disclosure Statement").

14.  On April 26, 2021, Debtor filed its Chapter 11 Plan of Reorganization [Dkt. No. 27] (the "Plan").

15.  The Plan purports to do the following, among other things:

a.  Pay the Priority Wage over thirty-six (36) months with two percent (2%) interest per annum;

b.  Allow the Alleged Secured Claim in full with four and a quarter percent (4.25%) interest per annum;

c.  Provide a ten percent (10%) distribution to unsecured creditors over twelve (12) months;

d.  Provide no distribution to insider claims; and

e.  Provides that current Equity Interests[2] in Debtor are retained in full and are not impaired under the Plan.

---

[2] Terms not defined in this Objection, shall be construed to have the same meaning as attributed to such in the Plan.

*See* Plan, Art., V.B.

16.     The Plan provides that "Class 5: Allowed Insider Claims" shall not be paid under the Plan, and are deemed to reject the Plan, "but their claims will not be counted for or against Confirmation." *See* Plan, Art. V.B. "Allowed Insider Claims" is not a defined term in the Plan, but presumably means the Allowed Claims of statutory insiders.

## OBJECTION

### I.     Summary.

17.     The Committee has no choice but to object to the proposed Plan. To date, Debtor has failed to provide the Committee with requested information including, but not limited to:

> a.     Backup for the scheduled Priority Wage Claim;
>
> b.     Any information related to security of $8.4 million in Alleged Secured Debt;
>
> c.     Any information related to the payment to Debtor of $4.9 million of the Alleged Secured Debt;
>
> d.     Post-Petition Payments tied to Debtor Invoices to establish value of 11 U.S.C. § 549 claims;
>
> e.     Historic payments by Debtor tied to pre-petition invoices to assist in establishing value of 11 U.S.C. §§ 547–548 claims; and
>
> f.     Documents and explanation relating to the scheduled Kinwong Electronic claim that makes up over half of the scheduled unsecured creditor pool – but as to which a proof of claim was not filed.

18.     The Committee has filed a 2004 Motion [Dkt. No. 71] regarding the above missing information, among other requested information, which 2004 Motion remains pending before this Court as of the date of this Objection.

19.     The Committee simply does not possess adequate information to fully evaluate the financial statements in Debtor's proposed Plan. Unless and until the Debtor complies with its

HB: 4825-9697-7655.5

obligations regarding disclosure of such necessary information for the Committee's review, the Committee would request that this Court deny confirmation of the Plan.

20. Moreover, based on the information that has been provided to date, Debtor's proposed Plan woefully fails to meet the Bankruptcy Code's standards established for Confirmation and should be denied.

21. As will be detailed below, the Plan:

    a.    Fails the best interests of creditors test pursuant to 11 U.S.C. § 1129(a)(7);

    b.    Violates the absolute priority rule pursuant to § 1129(b)(2)(B)(ii), as the Plan would restore Equity Interests, but significantly impairs two senior classes, one of which is deemed to reject the Plan;

    c.    Treats like classes of creditors differently in violation of 11 U.S.C. § 1123(a)(4);

    d.    Fails to provide any value to unsecured creditors in the over $3.5 Million in pre-petition avoidable transfers;

    e.    Debtor failed to schedule an unsecured claimant with at least $2.5 Million in unsecured debt or solicit the Plan to such creditor; and

    f.    The Plan was not proposed in good faith pursuant to 11 U.S.C. § 1129(a)(3).

## II. Debtor's Plan Does Not Satisfy the Requirements of 11 U.S.C. § 1129(a)(7) and is not in the Best Interests of Creditors.

22. Section 1129(a)(7) is commonly referred to as the "best interests of creditors test." It requires that, for a given class of claims, each holder of a claim or interest in such class must either (i) accept the plan or (ii) "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain" in a hypothetical Chapter 7 liquidation (i.e., get at least what it'd get in a Chapter 7 liquidation, with interest on any payment stream). *See* 11 U.S.C. §

1129(a)(7).  Simply put, Section 1129(a)(7) provides an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation.

23.    Debtor's Liquidation Test to comply with the best interest test appears in its Disclosure Statement as follows:

### Liquidation Analysis

Liabilities shown below are as scheduled by the Debtor, unless the Claimant has filed a proof of claim stating a different amount.

The Debtor estimates that the value of the Real Property in a forced liquidation sale, such as a foreclosure under Texas law, would yield net proceeds of approximately 75% of the market value as scheduled by the Debtor.

The Debtor estimates that the value of all personal property, i.e., receivables, furniture, fixtures, machinery, equipment and inventory, would be approximate one-half of market value as scheduled by the Debtor.

### Assets

| | |
|---|---|
| Real property  (75% market value) | $1,875,000 |
| Cash on hand and in bank accounts | $343,866 |
| Deposits and prepayments | $150,906 |
| All personal property (1/2 market value) | $ 2,055,917 |
| Less 5% liquidation costs for real property | <$93,750.00> |
| **Total Assets** | **$ 4,331,939.00** |

**Liabilities**

| | |
|---|---|
| Administrative Expenses and UST Fees | $10,000[1] |
| Priority Tax Claims | $2,339 |
| Priority Wage Claims | $288,326 |
| Other Priority Claims | $8,270 |
| Secured Claims of Dhirajal Babaria | $9,500,000 |
| Secured Claims of Carrollton/FB ISD | $6,147 |
| General Unsecured Claims | $2,978,197 |
| Equity Interests | |
| **Total Liabilities** | **$ 12,793,279** |

**TOTAL ASSETS LESS TOTAL LIABILITIES**            <$ 8,461,340>

*NOTE:* **Under the above liquidation analysis, only Administrative, Priority and Secured Claims would receive distributions in a Chapter 7 case. Unsecured Claims would receive nothing in Chapter 7. Under this Plan; however, Unsecured Claimants will receive 20% of their Claims. This Plan does not contemplate a liquidation of the Assets.**

*See* Disclosure Statement, Art. IV, pgs. 13–14.

24.    Notwithstanding the issues regarding Debtor's estimated costs and discounted value of Debtor's assets through a liquidation, the Liquidation Analysis is based on inaccurate (or unproven) facts – and cannot be relied upon by this Court or Debtor's creditors in voting on this Plan.

**i.    *Insider's Pre-Petition Withdrawal of $1 Million, and Post-Petition Repayment of $700,000.***

25.    First, Debtor lists "cash on hand" as $343,866. *See* Disclosure Statement, Art. IV, pg. 13.   In Debtor's latest operating report, cash on hand as of June 30, 2021, now totals $1,611,756. *See* Monthly Operating Report for Month Ending June 30, 2021 [Dkt. No. 56].

26.    This wide discrepancy of over $1.2 Million in available cash is partially explained by the Owner's withdrawal of $1 Million from Debtor's Chase Account on January 28, 2021 (within the Preference Period).  *See* Produced Documents, attached as ***Exhibit A*** hereto, Bates Numbers EC-0000928-EC00000937.  The Owner repaid $700,000 to Debtor on March 29, 2021 – <u>post-petition</u> – however, such amount was opportunely excluded from the Liquidation Analysis.

*See* Monthly Operating Report for Month Ending March 31, 2021 [Dkt. No. 26] ("March Operating Report"). The only apparent reference to the Insider's pre-petition withdrawal and post-petition re-payment, is in its Schedule A, where Debtor asserts that it holds a "Receivable from Owner. Funds transferred to company on 3/29/2021" valued at $700,000.00. *See* Schedule A/B, Part 11, 77.

27.     It is black letter law that the best interest test and an associated liquidation analysis must be conducted "as of the effective date of the plan" – not on the Petition Date. *See* 11 U.S.C. § 1129(a)(7); *see also Southern Pac. Transp. Co. v. Voluntary Purchasing Groups*, 252 B.R. 373 (E.D. Tex. 2000) ("Because such matters as asset valuation and the estimation of liquidation recoveries can be drastically affected by the timing of one's calculations, a court must ensure that all financial projections incorporated into its analysis reflect the resources that are likely to be available to a debtor on a plan's effective date.")

ii.     ***Debtor's Failure to Provide Evidence of the Alleged Secured Claim.***

28.     In its Schedule D, Debtor asserts the Owner holds a blanket senior secured interest in the amount of $9.5 Million in all of Debtor's assets. *See* Schedule D, 2.1–2.3.

29.     After first requesting evidence of the Alleged Secured Debt on July 21, 2021, the Debtor has failed to provide the Committee evidence that Owner holds a security interest in anything but $1.1 Million of debt (that $1.1 Million of debt was assigned debt from the previous owner). **To be clear, Debtor has failed to provide to Committee evidence of any loan and/or payment to Debtor by Owner since his acquisition of Debtor in 2019.** Debtor's account statements reveal no payments to the Debtor from Owner in the relevant time periods. *See* Exhibit A, Bates Nos. EC-000792-EC-000959, EC-001082-EC-001116. Upon information and belief, Debtor's only bank accounts during the relevant period were the reviewed First Business Bank

account and the Chase Bank account.  As such, at least $8.4 Million of the Alleged Secured Claim is likely not based on any contribution to Debtor by Owner and, as such, is avoidable – and cannot be considered a valid secured claim for purposes of the Liquidation Analysis.

### iii.    *Debtor's Failure to Provide Evidence of the Priority Wage Claim.*

30.    Debtor's Schedule E/F asserts the Priority Wage Claim as to employees in the total amount of $288,326.20.  *See* Schedule E/F, Part 1, 2.1–2.2.

31.    The Committee believes such amount appears unexpectedly large given the size and nature of the company and has requested detail for this claim from Debtor.

32.    To date, Debtor has failed to provide any detail supporting the Priority Wage Claim to Committee.

33.    The Committee would note that the alleged Priority Wage Claim listed by Debtor in its Schedule E/F, Part 2.1 is $130,080.06 – which exactly matches the $130,080.06 that Debtor paid to Paycom (Debtor's payroll provider) on March 10, 2021.  *See* March Operating Report, pg. 25.  As such, upon information and belief, at least $130,080.06 is <u>not</u> properly scheduled and is not a current liability of the estate.[3]  The Committee has no information on the remaining roughly $158,000 that is also asserted as a Priority Wage Claim.

34.    The paid Priority Wage Claim cannot be considered a valid secured claim for purposes of the Liquidation Analysis.

---

[3] On August 23, 2021, Debtor filed its *Motion Nunc Pro Tunc to Pay Pre-Petition Payroll* [Dkt. No. 80] (the "<u>Payroll Motion</u>").  In this Payroll Motion, Debtor admits that is paid $128,014.12 that "are priority claims under 11 U.S.C. Section 507(a)(4)." *See* Payroll Motion, ¶ 3.  Debtor has not revised her Schedule E/F nor explain the small financial discrepancy in the Payroll Motion's amount versus the Priority Wage Claim.

### iv. *Debtor Fails to Value Over $3.5 Million in Preference Period Transfers.*

35.     Debtor has listed roughly $2.3 Million in transfers within ninety (90) days of the Petition Date (the "Preference Period") in its Statement of Financial Affairs that exceed the statutory threshold. *See* Statement of Financial Affairs, Part 2, 3.1, *et al*.

36.     Debtor has provided to Committee its bank account statements for January 2021-March 2021 (the "Preference Period Account Statements"). *See* Exhibit A, Bates Nos. EC-000927-EC-000959. After analysis of the Preference Period Account Statements, the Committee has identified $3,526,940.31 (the "Preferences") in transfers to third-parties that exceed the statutory threshold.

37.     Debtor has wholly failed to account for the Preferences in its Liquidation Analysis.

### v. *Summary.*

38.     The inaccuracies and misstatements in Debtor's Schedules and the Liquidation Analysis are nothing less than appalling.

39.     If Debtor cannot prove that Alleged Secured Debt exists – which is unlikely given the time that has lapsed since the information was requested and, most importantly, that the Debtor's books and records reveal no payments made by Owner that would correlate with the Alleged Secured Debtor – then the Liquidation Analysis would fail. The Liquidation Analysis also fails understates "cash on hand" by over $1.2 Million, fails to account for any value as to $3.5 Million in Preferences, and includes claims that Debtor admits do not exist (the Priority Wage Claim).

40.     This Court, the Committee, and the Debtor's creditors cannot rely on Debtor's inaccurate Liquidating Analysis to determine whether this Plan is actually in the best interests of

HB: 4825-9697-7655.5

creditors as required pursuant to Section 1129(a)(7) of the Bankruptcy Code. Any votes in favor of the Plan were based on inaccurate information presented by Debtors.

41. This Court should deny the Plan as it fails to comply with confirmation requirements of Section 1129(a)(7) of the Bankruptcy Code.

### III. The Plan Violates the Absolute Priority Rule Pursuant to § 1129(b)(2)(B)(ii), as the Plan Restores Equity Interests but Impairs Senior Creditor Classes.

42. Pursuant to Section 1129(b)(2)(B)(ii) of the Bankruptcy Code, no holder of a claim or interest that is junior to another cram down claim shall receive any distribution on account of such junior claim or interest until the cram down classes are satisfied in full. *In re ADPT DFW Holdings LLC*, 577 B.R. 232, 250–51 (Bankr. N.D. Tex. 2017). In other words, according to the absolute priority rule, senior interests are entitled to full satisfaction before any return may be provided for junior interests. *In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006).

43. "The absolute priority rule is a component of the 'fair and equitable' requirement of Section 1129(b), which only comes into play if there is a rejecting *class*." *In re United Marine, Inc.*, 197 B.R. 942, 948 (Bankr. S.D. Fla. 1996).

44. Pursuant to Debtor's Plan, Class 5 (Allowed Insider Claims) will receive no distribution and are impaired and deemed to reject the Plan. *See* Plan, Art. V.B. Pursuant to Debtor's Plan, Class 4 (General Unsecured Claims) will receive a ten percent (10%) pro rata distribution. *See* Plan, Art. V.B.

45. Despite the impairment of these two senior classes under the Plan, Equity Interests are unimpaired and restored in full on the Effective Date. *See* Plan, Art. V.B. Equity Interests are making no new consideration contribution in conjunction with the Plan. *See generally* Plan.

46.     The Plan clearly violates the absolute priority rule as to Class 5 (Allowed Insider Claims).  Despite Debtor's statement in the Plan that Allowed Insider Claims "will not be counted for or against Confirmation" – a junior class cannot receive distribution in preference to a senior class of creditors that is deemed to reject the Plan.  *In re 431 W. Ponce De Leon, LLC*, 515 B.R. 660, 684 (Bankr. N.D. Ga. 2014) (proposed plan violated absolute priority rule when equity interest would receive distribution over a senior class that was deemed to reject the proposed plan); *see also In re Mirant Corp.*, 348 B.R. at 738; Plan, Art. V.B.

47.     Moreover, it is without debate that the Plan violates the absolute priority rule as to Class 4 (General Unsecured Claims) if such class votes to reject the Plan.  *See In re Mirant Corp.*, 348 B.R. at 738.  Equity Interests cannot be unimpaired under a Plan when general unsecured creditors are receiving only a small pro rata distribution under Section 1129(b)(2)(B)(ii) of the Bankruptcy Code.

48.     As an additional note, Courts have decided that "a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims." *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003).  Even if Debtor could prove that the Alleged Secured Debt is properly Scheduled, Debtor has not proven that Owner deserves interest on its claim – including any unsecured deficiency portion of the Alleged Secured Debt.

49.     This Court should deny the Plan as it fails to comply with confirmation requirements of Section 1129(b)(2)(B)(ii) of the Bankruptcy Code.

## IV.     The Plan Treats Like Classes of Creditors Differently in Violation of 11 U.S.C. § 1123(a)(4).

50.     Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."

51. Pursuant to Debtor's Plan, Class 5 (Allowed Insider Claims) will receive no distribution and are impaired and deemed to reject the Plan. *See* Plan, Art. V.B. Pursuant to Debtor's Plan, Class 3 (Allowed Secured Claim of DJ Barbaria) will be paid an unclear amount after allowed non-insider claims are paid, but will receive a 4.25% per annum interest until payment in made. *See* Plan, Art. V.B.

52. Owner (DJ Barbaria) is an insider of the Debtor. As such, both Class 3 and Class 5 would relate to Owner under the Plan.

53. The Plan fails to delineate whether Class 3 (Allowed Secured Claim of DJ Barbaria) contains any unsecured portion, although the definition of "Secured Claim" in the Plan would indicate that such is a possibility. *See* Plan, Art. I, 1.01.

54. If any portion of Class 3 (Allowed Secured Claim of DJ Barbaria) is unsecured, then an identical claim, that is the unsecured claims of Class 5 (Allowed Insider Claims)[4] are treated differently in violation of Section 1123(a)(4) of the Bankruptcy Code.

55. This Court should deny the Plan as it fails to comply with confirmation requirements of Section 1123(a)(4) of the Bankruptcy Code.

**V. The Plan Fails to Provide Any Value as to Avoidance Actions, Including Over $3.5 Million in Preference Period Transfers, in addition to Millions of Dollars in Unauthorized Post-Petition Transfers.**

56. As discussed *supra,* Debtor has listed roughly $2.3 Million in Preference Period Transfers in its Statement of Financial Affairs that exceed the statutory threshold. *See* Statement of Financial Affairs, Part 2, 3.1, *et al*.

---

[4] No statutory insider has filed a proof of claim in this case. *See* Claims Register. No other insider debt, outside of the Alleged Secured Claim, is scheduled. *See generally* Schedule A/B, Schedule D, Schedule E/F.

HB: 4825-9697-7655.5

57.     However, Debtor has provided to Committee the Preference Period Account Statements that reveal $3,526,940.31 in transfers during the Preference Period that exceed the statutory threshold. *See* Exhibit A, Bates No. EC-000927-EC-000959.

58.     Further, millions of dollars in Section 549 of the Bankruptcy Code actions are likely to exist in this case. "The purpose of section 549 is to allow the trustee to avoid those post-petition transfers which deplete the estate while providing limited protection to transferees who deal with the debtor. Fraud by the debtor and, except with respect to purchasers of real property, good faith on the part of the transferee are irrelevant to the application of this section." 5 COLLIER ON BANKRUPTCY ¶ 549.02 (15th Ed. rev. 2005).

59.     It is black letter law that court authorization is required before distribution by Debtor of pre-petition claims or adequate protection payments. *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Miller Min., Inc.*, 219 B.R. 219, 224 (Bankr. N.D. Ohio 1998). Debtor's filed monthly operating statements reveal that Debtor has made post-petition payments on pre-petition wages as well as pre-petition vendor invoices, as well as to equipment lessees, etc. *See* Monthly Operating Reports of Debtor [Dkt. Nos. 26, 41, 46, 56].

60.     **Debtor has not filed a single first day motion in this case** (and its Payroll Motion was filed over four (4) months after the Petition Date and only related to pre-petition payroll). *See generally* Case Docket, [Dkt. No. 80]. As a result, each payment from April 2021 through today can potentially be clawed back into the estate. *See* 11 U.S.C. § 549.

61.     Debtor has wholly failed to provide for the Preference and unauthorized post-petition transfers (as well as additional Chapter 5 Avoidance Actions) in its Plan. While Debtor has failed to provide Committee with sufficient data to estimate the value of the Preferences or post-petition transfer claims, the value to unsecured creditors is undoubtedly significant. This

Court should deny confirmation of the Plan until the Debtor provides the appropriate value of these claims to Debtor's creditors.

**VI.** **Debtor Failed to Schedule Over $2.5 Million in Liabilities to Texas Champion Bank and Failed to Solicit Texas Champion Bank to Vote on the Plan.**

62. Upon information and belief, Texas Champion Bank provided two (2) loans to Debtor pursuant to the Paycheck Protection Program (the "PPP"). The first PPP loan was issued to Debtor on May 11, 2020, in the amount of One Million Three Hundred Sixteen Thousand Nine Hundred Thirty-Five and 71/100 Dollars ($1,316,935.71). *See* Exhibit A, Bates Nos. EC-000822 -EC-000835. The second PPP loan was issued to Debtor on January 27, 2021, in the amount of One Million One Hundred Eighty-Eight Thousand Two Hundred Fifty-Two and 00/100 Dollars ($1,188,252.00). *See* Exhibit A, Bates Nos. EC-000928 -EC-000937. In total, Debtor took Two Million Five Hundred Five Thousand One Hundred Eighty-Seven and 71/100 Dollars ($2,505,187.71) (the "PPP Loan") from Texas Champion Bank pursuant to the PPP.

63. Debtor did not schedule Texas Champion Bank or the PPP Loan. *See generally*, Schedule E/F [Dkt No. 21].

64. Debtor did not receive Court authorization to accept the second PPP Loan. *See generally* Docket.

65. Texas Champion Bank does not appear on the Creditor Matrix. *See* Creditor Matrix [Dkt. No. 3].

66. Debtor did not solicit Texas Champion Bank to vote on its Plan. *See* Certificate of Service [Dkt. No. 49].

67. Despite numerous requests from the Committee, Debtor has provided no backup regarding the PPP Loans – and no evidence that the PPP Loans were forgiven.

HB: 4825-9697-7655.5

68.     On August 26, 2021, Texas Champion Bank filed a proof of claim [Claim No. 48] in the total amount of $1,195,121.07.

69.     If some or all of the PPP Loans were not forgiven, Debtor has failed to solicit Texas Champion Bank, an unsecured creditor with loans that nearly double the currently scheduled unsecured creditors.[5]   The voting implications are evident.

70.     Debtor cannot move forward with this Plan until it provides evidence of forgiveness of the PPP Loans.

## VII.    The Plan Was Not Proposed in Good Faith under 11 U.S.C. § 1129(a)(3).

71.     Under Bankruptcy Code section 1129(a)(3), a Chapter 11 plan may only be confirmed if it has been "proposed in good faith and not by any means forbidden by law."   The Debtor's Plan plainly fails to meet the good faith standard.

72.     "Good faith" is not defined by the Bankruptcy Code, but courts have found that "the term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objective and purposes of the Bankruptcy Code."   *In re Weber*, 209 B.R. 793, 797 (D. Mass. 1994).   The good faith standard requires that the Plan be proposed with good intentions to obtain a result that is consistent with the objectives and the purposes of the Bankruptcy Code.   *See In re PWS Holding Corp.*, 228 F. 3d 224, 243 (3rd Circ. 2000) ("For purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986))); *see also In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004) ("At its most fundamental level, the good faith requirement ensures that the

---

[5] Debtor has also failed to include the PPP Loans in its Liquidation Analysis. *See* Disclosure Statement, Art. IV, pgs. 13–14.

Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy . . . .").

73.     Whether the good-faith requirement is established is a fact intensive inquiry based on the totality of the facts and circumstances" that affords considerable discretion to the Court. *See In re W.R. Grace & Co.,* 475 B.R. 34, 88 (D. Del. 2012).  Indeed, "failure of a debtor to use the full reach of its disposable resources to repay creditors is evidence that a plan is not proposed in good faith because such conduct frustrates this objective."  *In re Walker*, 165 B.R. 994, 1001 (E.D. Va. 1994); *see also In re Shelton*, 370 B.R. 861, 867 (Bankr. N.D. Ga. 2007) ("a plan that proposes to pay 0% to creditors when a debtor could pay substantially more is not a plan proposed in good faith"); *In re Edmunds*, 350 B.R. 636, 649 (Bankr. D.S.C. 2006) ("[s]ince it appears from Debtors' respective Schedules I and J that they have sufficient projected disposable income to pay a greater distribution to general unsecured creditors than proposed in their current plans … Debtors' present plans were therefore not proposed in good faith").

74.     Moreover, a Plan is not proposed in good faith if the Plan and underlying Schedules are based on fraudulent or inaccurate information.  *See In re Multiut Corp*., 449 B.R. 323, 343 (Bankr. N.D. Ill. 2011).

75.     As discussed in Section II, the Debtor's underlying Schedules and assertions regarding the cash on hand and the Priority Wage Claim are inaccurate – and fail to account for at least $1.4 Million that would be available for distribution to unsecured creditors.  Debtor also asserts a $9.5 Million Alleged Secured Debt Claim for Owner for which $8.4 Million is completely unsupported in its own books and records.  Further, Debtor's Plan fails to account for Preferences, potentially worth $3.5 Million Dollars.

HB: 4825-9697-7655.5

76.     Debtor's Plan falls well short of any indicia of good faith.  The evidence shows that Debtor has overinflated secured debt by $8.4 Million, and fails to account for millions of dollars of valuable estate assets that are apparently unencumbered (or can be unencumbered through an avoidance action) and available to distribution to unsecured creditors.  This Plan fails to comport with the purpose of the Bankruptcy Code and is therefore not proposed in good faith under Section 1129(a)(3).  *See Multiut Corp*., 449 B.R. at 343 ("The Plan's failure to adequately reserve claims and causes of action the Debtor may have against third parties, the failure to accurately state the value of unsecured claims, and the substantially inaccurate calculation of the Plan's minimum percentage distribution to unsecured creditors demonstrate to the Court that the Plan has not been proposed in good faith.")

77.     This Court should deny the Plan as it fails to comply with confirmation requirements of Section 1129(a)(3) of the Bankruptcy Code.

## VIII.   The Debtor Has Not Made Requested Disclosures Regarding Its Assets.

78.     To date, Debtor has failed to provide the Committee, among other information, with:

    a.      Backup for the scheduled Priority Wage Claim;

    b.      Any information related to security of $8.4 million in Alleged Secured Debt;

    c.      Any information related to the payment to Debtor of $4.9 million of the Alleged Secured Debt;

    d.      Post-Petition Payments tied to Debtor Invoices to establish value of 11 U.S.C. § 549 claims;

    e.      Historic payments by Debtors tied to Invoices to assist in establishing value of 11 U.S.C. §§ 547, 548 claims;

    f.      Evidence of insurance; and

g. Documents and explanation relating to the scheduled Kinwong Electronic claim that makes up over half of the unsecured creditor pool – but as to which a proof of claim was not filed.

79. Due to Debtor's delays in the promised turnover of documents, the Committee filed its 2004 Motion on August 5, 2021.

80. Prior to any confirmation of any plan, Debtor should be required to present detail regarding the additional information requested by Committee. Upon information and belief, valuable Chapter 5 causes of action exist, as well as massive overstatements of secured debt. If such facts are confirmed upon review of the pertinent documentation, this Plan would fail to meet the best-interests of creditors test under Section 1129(a)(7) Bankruptcy Code, among other things.

81. This Debtor should not be permitted to delay production of pertinent documents while rushing through the plan process when there are open issues regarding its financials and assertion made in Schedules and the Plan.

## **CONCLUSION**

**WHEREFORE**, the Official Committee of Unsecured Creditors respectfully requests that this court deny confirmation of this Plan as it fails to meet the requirements of 11 U.S.C §§ 1129(a)(3), 1129(a)(7), 1129(b)(2)(B)(ii), 1123(a)(4), and the Debtor has failed to provide the Committee and the U.S. Trustee sufficient time to review information related to its books and records prior to a confirmation hearing on any amended Chapter 11 Plan, and requests such further relief as this Court deems just and proper.

Dated: August 26, 2021

HB: 4825-9697-7655.5

Respectfully Submitted,

**HUSCH BLACKWELL LLP**

By:     */s/ Buffey E. Klein*
         Buffey E. Klein
         Texas State Bar No. 24032515
         1900 N. Pearl, Suite 1800
         Dallas, TX 75201
         (214) 999-6100
         (214) 999-6170 (fax)
         buffey.klein@huschblackwell.com

         Caleb T. Holzaepfel (admitted *pro hac vice*)
         736 Georgia Avenue, Suite 300
         Chattanooga, TN 37402
         (423) 266-5500
         (423) 266-5499 (fax)
         caleb.holzaepfel@huschblackwell.com

**PROPOSED COUNSEL FOR OFFICIAL
COMMITTEE OF UNSECURED CREDITORS
OF ELECTROTEK, INC.**

### CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the foregoing pleading has been forwarded via this Court's CM/ECF notification system to the parties registered for such service on August 26, 2021.

                                    */s/ Buffey E. Klein*
                                    Buffey E. Klein