5Buffey Klein (TX Bar 24032515 )
HUSCH BLACKWELL LLP
1900 N. Pearl Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 999-6100
Facsimile: (214) 999-6170
Email: buffey.klein@huschblackwell.com

Caleb T. Holzaepfel
(admitted *pro hac vice*)
HUSCH BLACKWELL LLP
736 Georgia Avenue, Suite 300
Chattanooga, TN 37402
Telephone: (423) 266-5500
Facsimile: (423) 266-5499
Email: caleb.holzaepfel@huschblackwell.com

*Counsel for the Official Committee*
*of Unsecured Creditors for Electrotek Corporation*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Electrotek Corporation, | ) | Case No. 21-30409-mvl-11 |
| | ) | |
| Debtor. | ) | |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ELECTROTEK CORPORATION TO APPOINT CHAPTER 11 TRUSTEE

The Official Committee of Unsecured Creditors of Electrotek Corporation (the "Committee"), through counsel, hereby moves for the appointment of a Chapter 11 Trustee, pursuant to 11 U.S.C. § 1104 and Rule 9014 of the Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") and N.D. Tex. L.B.R. 9014-1, and in support thereof, the Committee states as follows:

### INTRODUCTION

This Committee finds itself in a unique and unusual position. The Debtor is making a comfortable monthly profit based on its recent financial statements – and may only have secured debt of a little over $1 Million Dollars in the face of $8+ Million in assets. There is no reason why a reformulated plan of reorganization cannot be proposed that repays Debtor's unsecured creditors a substantial, if not a full return on their unsecured debts.

1

However, the Committee cannot accomplish this task in the face of Debtor's dishonesty and obstruction. In complete abdication of its fiduciary duties to its creditors, Debtor continues to press forward with a Plan that provides only a ten (10) percent payment to unsecured creditors, while asserting $9.5 Million in secured debt owed to an insider and refusing to provide evidence of such debt to the Committee or its creditors six months into this case. The additional failings, misstatement, and inaccuracies in Debtors' Schedules, Statement of Financial Affairs, and Plan, including, but not limited to, failing to file a single first day motion as to an operating Chapter 11 debtor, failing to schedule or provide value in its Plan to more than $3.5 Million in avoidance actions, and understating its cash on hand by $1.2 Million, are nothing short of appalling.

The recourse that Committee believes serves the best interests of Debtor's creditors – and the estate – is to appoint a Chapter 11 Trustee to investigate Debtor's books and records, operate the estate, and prepare consensual plan of reorganization with the Committee's assistance and input.

Section 1104(a) of the Bankruptcy Code sets out the standard for appointment of a Chapter 11 Trustee. This case meets both the "for cause" standard and the "best interests" standard for appointment of an independent Chapter 11 Trustee.

As evidenced by the Committee's recently filed *Objection of the Official Committee of Unsecured Creditors of Electrotek Corporation to Confirmation of Chapter 11 Plan for Electrotek Corporation* [Dkt. No. 90] (the "Plan Objection"), Debtor Electrotek Corporation (the "Debtor") has (1) failed to fulfill a number of basic functions required by a Chapter 11 debtor, including, but not limited to, filing any first day motions to seek authority to make certain payments and continue business operations, (2) submitted misleading and/or inaccurate Schedules, Statements of Financial Affairs, and a Disclosure Statement– and has failed to revise Schedules after admitting

2

inaccuracies and misstatements, (3) failed or refused to provide basic documents supporting claims to the Committee that the Debtor has scheduled, and (4) attempted to push through a bad faith Plan that fails to meet the basic requisite standards for confirmation of a Chapter 11 plan. Moreover, the Debtor's relationship with the Committee, the representative of Debtor's unsecured creditors— can be described, at best, as acrimonious. Debtor's failures and misstatements have given rise to various Section 549 of the Bankruptcy Code claims, increased costs for the estate and its creditors – while abdicating any semblance of fiduciary duty to its creditors in favor of existing equity ownership.

As such, this Court has authority to use its discretion to appoint an independent Chapter 11 Trustee to examine Debtor's business records and appropriately administer this bankruptcy case and should do so.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 157 and § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested is sections 1104(a) of Title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rule 9014, and N.D. Tex. L.B.R. 9014-1.

## BACKGROUND

4.      On March 8, 2021 (the "Petition Date"), Debtor, as debtor and debtor-in-possession in the above-referenced Chapter 11 case (the "Bankruptcy Case"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and designated the Bankruptcy Case under Subchapter V.

5.      Since the Petition Date, upon information and belief, the Debtor continues to manage and operate its businesses as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      Debtor amended its voluntary petition on April 15, 2021 and thereby removed the Subchapter V designation. *See* Dkt. No. 24.

7.      On July 8, 2021, the United States Trustee for the Northern District of Texas (the "UST") organized and appointed the Committee, which was subsequently amended on July 27, 2021, and consists of the following members: (i) Sid Grinker Restoration, Inc.; (ii) Taiyo America, Inc.; (iii) Uyemura International Corp., and (iv) Hagen Decorators Inc. Jeff Oscarson, Chief Financial Officer of Sid Grinker Restoration, Inc., was selected by the Committee as the Chairman of the Committee.

8.      On July 13, 2021, the Committee selected Husch Blackwell LLP as its counsel, and the Court entered an Order approving the Committee's application to employ Husch Blackwell LLP on September 23, 2021. *See* Dkt. No. 111.

***Debtor's Schedules and Statement of Financial Affairs.***

9.      The Debtor filed its *Schedules A/B and D-H* [Dkt. No. 21] and its *Statement of Financial Affairs* [Dkt. No. 22] on March 29, 2021.

10.     In its Schedule D, Debtor asserts that its thirty (30%) equity owner and Chief Executive Office, Dhirajal Barbaria (the "Owner"), holds a senior secured interest in the amount of $9.5 Million in all of Debtor's assets (the "Alleged Secured Claim"). *See* Schedule D, 2.1–2.3.

11.     In its Schedule A, Debtor asserts that it holds a "Receivable from Owner. Funds transferred to company on 3/29/2021" valued at $700,000.00. *See* Schedule A/B, Part 11, 77.

12. Debtor's Schedule E/F asserts priority wage claims as to employees in the total amounts of $288,326.20 (the "Priority Wage Claim"). *See* Schedule E/F, Part 1, 2.1–2.2.

### Debtor's Plan and Disclosure Statement

13. On April 26, 2021, Debtor filed its Disclosure Statement (the "Disclosure Statement"), and on June 24, 2021, the Court entered an Order approving the Disclosure Statement. *See* Dkt. Nos. 28, 47.

14. On April 26, 2021, Debtor filed its Chapter 11 Plan of Reorganization [Dkt. No. 27] (the "Plan").

15. The Plan, among other things, proposes the following treatment of Debtor's creditors and equity holders:

    a. Payment of the Priority Wage Claim over thirty-six (36) months with two percent (2%) interest per annum;

    b. Payment of the Alleged Secured Claim in full with four and a quarter percent (4.25%) interest per annum;

    c. Payment of a ten percent (10%) distribution to general unsecured creditors over twelve (12) months;

    d. No distribution to insider claims; and

    e. Provides that current Equity Interests[1] in Debtor are retained in full and are not impaired under the Plan.

*See* Plan, Art. V.B.

16. On August 26, 2021, the Committee filed its Objection.

17. At the hearing on September 1, 2021, the Court continued the hearing on confirmation of the Debtor's Plan.

### Status of Discovery Pertinent to Plan and Bankruptcy Case

---

[1] Terms not defined in this Motion, shall be construed to have the same meaning as attributed to such in the Plan.

18.     Upon retention, the Committee requested a variety of documents from Debtor. Debtor's counsel agreed to provide such documents – and relayed the same to the Court at the July 26, 2021 hearing on the Committee's *Emergency Motion for Extension of Time and for Continuance Regarding Debtor's Chapter 11 Plan of Reorganization.*

19.     When the documents were not forthcoming as promised, the Committee filed its *Motion for Order Directing Records Examination of Debtor Pursuant to Federal Rules of Bankruptcy Procedure 2004* [Dkt. No. 71].   The Court granted the Committee's Motion on September 9, 2021.

20.     The Committee has filed a Motion for Order Directing Records Pursuant to Federal Rule of Bankruptcy Procedure 2004 (the "2004 Motion") [Dkt. No. 71] regarding certain missing information or perceived misstatement by Debtor's in its filings, among other requested information.

21.     The Court granted the 2004 Motion on October 9, 2021, after notice and hearing – setting October 1, 2021, as Debtor's deadline to produce the documents set forth on *Exhibit A* to the Motion.

22.     To date, Debtor has failed to provide the Committee with the following categories of documents:

      a.      Documents and correspondence supporting the Priority Wage Claim;

      b.      Documents and correspondence supporting $8.4 Million in Alleged Secured Debt;

      c.      Documents and correspondence related to payments made to Debtor reflecting $4.9 Million of the Alleged Secured Debt;

      d.      Communication regarding transfers to Debtor or from Debtor by equity holders or any Relation to the forementioned individuals; and

e.     Any evidence of insurance or post-petition insurance payments (which the Committee believes have been made post-petition without Court authorization).

23.     Most notably, while some information pertinent to the documents requested in the 2004 Motion have been produced, documents and information sufficient to resolve the issues surrounding the Alleged Secured Debt still remain outstanding.

## **ARGUMENT**

24.     Section 1104(a) of the Bankruptcy Code sets forth the standard for appointment of a Chapter 11 Trustee and states as follows:

At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1)    for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2)    if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

25.     Courts in this jurisdiction apply a clear and convincing standard when considering a motion to appoint a Chapter 11 Trustee, and the burden of proof falls upon the movant to show that the appointment of a trustee is appropriate. *See, e.g.*, *In re Patman Drilling Intern., Inc.*, 2008 WL 724086, at *6 (Bankr. N.D. Tex. Mar. 14, 2008).

26.     The two subsections of Section 1104(a) of the Bankruptcy Code set out similar, but not identical, sets of grounds and cause for the appointment of a Chapter 11 Trustee. *See* 11 U.S.C. § 1104(a)(1)–(2).

27.     Section 1104(a)(1) of the Code focuses on:

> the materiality of any misconduct, the debtor-in-possession's evenhandedness or lack thereof in dealings with insiders and affiliated entities in relation to other creditors, the existence of pre-petition voidable preferences or fraudulent conveyances, whether any conflicts of interest on the part of the debtor-in-possession are interfering with its ability to fulfill its fiduciary duties, and whether there has been self-dealing or squandering of estate assets.

*In re Keeley and Grabanski Land Partnership*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011).  A court must appoint a trustee if it finds that cause of this type exists.  *See id*.

28.     Notably, a body of case law exists that finds that acrimony between a debtor and one or more of its creditors may rise to the level of "cause" requiring the appointment of a trustee under section 1104(a)(1).  *See, e.g., In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (*citing In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599, 600 (5th Cir. 1996), *cert. den.* 519 U.S. 808 (1996)). These cases find appointment of a trustee appropriate when a debtor-in-possession's actions and interests conflict so strongly with creditors' interests that the emplacement of a third party presents the only option to move through the plan process.  *See Marvel*, 140 F.3d at 473 (finding that parties in control of debtor had "unhealthy conflict of interest" between their own interests in case and the interest of other parties resulted in "deep-seeded conflict and animosity" between the debtor and its lenders, but also in "the lack of confidence all creditors had in the [controlling parties'] ability to act as fiduciaries); *In re The Bible Speaks*, 74 B.R. 511, 512 (Bankr. D. Mass. 1987) ("The need for a neutral party to mediate disputes between the debtor and its creditors is ground for a trustee's appointment").

29.     Section 1104(a)(2) of the Code provides a more flexible standard for appointment of a Chapter 11 Trustee. "A Bankruptcy Court has particularly wide discretion to appoint a trustee under the flexible standard of § 1104(a)(2) of the Bankruptcy Code, even when no cause exists under § 1104(a)(1)." *See Keeley*, 455 B.R. at 165.

30.     Under section 1104(a)(2), courts consider:

> (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for the debtor's reorganization; (3) confidence, or lack thereof, of the business community and creditors in present management; and (4) the benefits derived by appointment of a trustee, balanced against the costs of appointment.

*Id*. at 164–65 (citing *In re Ionosphere Clubs, Inc*., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); *In re Colorado–Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990)). Section 1104(a)(2) permits a court to appoint a Chapter 11 trustee even where there is or was no pre- or post-petition fraud, mismanagement, or similar bad acts or where the evidence is not yet sufficient to support a finding of such bad acts.

**A.     Cause Exists to Appoint a Chapter 11 Trustee in this Matter.**

31.     "Cause" exists in this case because of the dishonesty, incompetency, and/or gross mismanagement of the affairs of the Debtor by its current management and due to the Debtor's relationship with the Committee.

32.     Here, there is clear and convincing evidence that the Debtor has failed to provide adequate documentary support of basic transactions supporting the Alleged Secured Claim or the Priority Wage Claim to necessitate the appointment of a trustee. Similarly, the Debtor has failed to properly account for certain pre-petition transactions, failed to schedule millions of dollars in pre-petition debt, failed to schedule millions of dollars in potential assets, and failed file a single first day motion, suggesting that the Debtor is likely operating in direct violation of the Bankruptcy

Code without authority to do so. Whether such failures are the result of dishonesty or incompetence – such misstatements of fact, but for the Committee's intervention, would have resulted in severe harm to Debtor's creditors, and could have only served to benefit Debtor's insiders.

33. Furthermore, the acrimonious relationship between the Debtor and the Committee underscores the need for a neutral third-party to act as a mediator to allow this case to progress forward.

### i. *Debtor's Failure to Provide Evidence of the Alleged Secured Claim.*

34. In its Schedule D, Debtor asserts the Owner holds a blanket senior secured interest in the amount of $9.5 Million in all of Debtor's assets. *See* Schedule D, 2.1–2.3.

35. After first requesting evidence of the Alleged Secured Debt on July 21, 2021, the Debtor has failed to provide the Committee with evidence that Owner holds a security interest in anything but $1.1 Million of debt (that $1.1 Million of debt was assigned debt from the previous owner– and Debtor has still failed to show to Committee that the $1.1 Million was actually deposited with Debtor). **To be clear, Debtor has failed to provide to Committee evidence of any loan and/or payment to Debtor by Owner since his acquisition of Debtor in 2019**.[2] Debtor's account statements reveal no payments to the Debtor from Owner in the relevant time periods. *See* Produced Documents, attached as *Exhibit A* hereto, Bates Nos. EC-000792-EC-000959, EC-001082-EC-001116. Upon information and belief, Debtor's only bank accounts during the relevant period were the reviewed First Business Bank account and the Chase Bank

---

[2] Debtor provided evidence to Committee that a company named "SVTronics, Inc." (an active Texas Corporation) deposited $3.5 Million with Debtor to, allegedly, pay off a line of credit with First Business Bank. Although repeated requests have been made by Committee, Debtor has failed to provide an explanation as to how a third-party corporation's deposit gave rise to any part of the Alleged Secured Claim of the Insider. Moreover, SVTronics, Inc. is not scheduled as a creditor or an equity owner of Debtor. *See generally* Schedules A-H, Statement of Financial Affairs.

account. As such, at least $8.4 Million of the Alleged Secured Claim is likely not based on any contribution to Debtor by Owner and, as such, is avoidable – and cannot be considered a valid secured claim.

36. Debtor's counsel was confronted with its failure to evidence the Alleged Secured Claim by Committee nearly two months ago. To date, Debtor's counsel has provided no explanation or additional documentation that would support the Alleged Secured Debt. In fact, in Debtor's most recent Monthly Operating Report for July 2021 [Dkt. No. 76], Debtor has revised its Alleged Secured Debt to $6.5 Million without explanation or modification to its proposed Plan or filed Schedules.

37. However, despite the lack of any support for the Alleged Secured Claim, based on Debtor's proposed Plan and the Schedules, the Debtor has allowed the Alleged Secured Claim in the amount of $9.5 million. This alone is indicative of the Debtor's dishonesty, incompetence, or gross mismanagement of its affairs and justifies the appointment of a trustee.

## ii. *Failure to Identify Records Supporting the Priority Wage Claim.*

38. Debtor's Schedule E/F asserts the Priority Wage Claim as to employees in the total amount of $288,326.20. *See* Schedule E/F, Part 1, 2.1–2.2.

39. To date, Debtor has failed to provide any detail supporting the Priority Wage Claim to Committee, despite the Committee's requests.

40. The Priority Wage Claim listed by Debtor in its Schedule E/F, Part 2.1 is $130,080.06 – which exactly matches the $130,080.06 that Debtor paid to Paycom (Debtor's payroll provider) on March 10, 2021. *See* March Operating Report, pg. 25. As such, upon

information and belief, at least $130,080.06 is <u>not</u> properly scheduled and is not a current liability of the estate.[3]

41.     The Committee has only received a list of the asserted value of accrued vacation time to support the remaining balance of approximately $158,000 that is also asserted as a Priority Wage Claim.

42.     Debtor has failed to explain how accrued vacation time for existing employees is a Priority Wage Claim and why such employees are not retaining accrued vacation time in ordinary course.  Moreover, a breakout of those employees who are no longer with Debtor who might be entitled to payment for accrued vacation pay versus existing employees has not been produced, despite multiple requests from the Committee.

43.     Properly managing payroll and payroll records is a basic business function necessary for all businesses. However, as indicated here, the Debtor is incapable of supporting its proposed Priority Wage Claim. The Debtor's inability to produce its records is indicative of the Debtor's incompetence or gross mismanagement of its most basic business functions and supports the need for the appointment of a trustee.

### *iii.     Owner's Pre-Petition Withdrawal of $1 Million, and Post-Petition Repayment of $700,000 Excluded from Disclosure Statement.*

44.     As further support for the appointment of a trustee, the Debtor's record keeping and reporting to this Court have lacked consistency or reliability – and may shed light on a dishonest transactions occurring following the Petition Date.

---

[3] On August 23, 2021, Debtor filed its *Motion Nunc Pro Tunc to Pay Pre-Petition Payroll* [Dkt. No. 80] (the "<u>Payroll Motion</u>").  In this Payroll Motion, Debtor admits that is paid $128,014.12 that "are priority claims under 11 U.S.C. Section 507(a)(4)." *See* Payroll Motion, ¶ 3.  Debtor has not revised Schedule E/F nor explained the small financial discrepancy in the Payroll Motion's amount versus the Priority Wage Claim.

45. The Disclosure Statement reflects that the Debtor had "cash on hand" of $343,966 as of April 26, 2021. However, in the Debtor's operating report for the period ending June 30, 2021, the Debtor's "cash on hand" balance is reflected as $1,611,756. [*See* Dkt. No. 56].

46. This wide discrepancy of over $1.2 Million in available cash is partially explained by the Owner's withdrawal of $1 Million from Debtor's Chase Account on January 28, 2021 (in the Preference Period). *See* Exhibit A, Bates Numbers EC-0000928-EC00000937. The Owner repaid $700,000 to Debtor on March 29, 2021 – post-petition – and such amount was opportunely excluded from the Liquidation Analysis. *See* Monthly Operating Report for Month Ending March 31, 2021 [Dkt. No. 26] ("March Operating Report"); *see generally* Disclosure Statement, Art. IV, pg. 13–14. [Dkt No. 28]. The only apparent reference to the Insider's pre-petition withdrawal and post-petition re-payment, is in its *Schedule A*, where Debtor asserts that it holds a "Receivable from Owner. Funds transferred to company on 3/29/2021" valued at $700,000.00. *See* Schedule A/B, Part 11, 77.

47. It is black letter law that the best interest test and an associated liquidation analysis must be conducted "as of the effective date of the plan" – not on the Petition Date. *See* 11 U.S.C. § 1129(a)(7); *see also Southern Pac. Transp. Co. v. Voluntary Purchasing Groups*, 252 B.R. 373 (E.D. Tex. 2000).

48. Moreover, the Committee is troubled by the Debtor's blatant disregard of the avoidable transfer that arose from Owner's withdrawal of $1 Million just prior to the Petition Date. The $700,000 returned post-petition relates to an avoidable transfer and the value thereof should be provided to Debtor's creditors under a Plan. Instead, Debtor ignores the transfer and repayment in its Plan and Disclosure Statement.

49.     Accordingly, the Debtor's exclusion of the $700,000 repayment in its Disclosure Statement justifies the appointment of a trustee for "cause" because of the Debtor's dishonesty, incompetence or gross mismanagement.

### iv.     *Debtor's Failure to File Any First Day Motions Constitutes Incompetency or Gross Mismanagement.*

50.     A crucial step in any successful Chapter 11 filing is the filing "first day motions" that seek court approval to take certain actions necessary to maintain the debtor's business operations that cannot be taken without advance court approval. Common examples of first day motions include motions to use cash collateral, for authority to pay insurance premiums, for authority to pay pre-petition wages, and for authority to pay pre-petition charges to certain vendors critical to the debtor's operations.

51.     **Here, the Debtor failed to file a single first day motion – in an operating Chapter 11 case.**

52.     Debtor waited until August 23, 2021—nearly six months after the Petition Date—to file a request *nunc pro tunc* to March 11, 2021 to pay its pre-petition employee wages of $128,014.12 (the "<u>Payroll Motion</u>"). [*See* Dkt. No. 80].  Although the unauthorized payment on pre-petition wages appears in the March 2021 Monthly Operating Report, the Payroll Motion casts blame to the on-site manager who did not understand the prohibition of paying pre-petition debt post-petition applied to employees' wages. *See* Dkt. No. 80, ¶ 2.

53.     Moreover, upon information and belief, the Debtor is paying pre-petition benefits to employees post-petition, is making insurance payment premiums, has paid certain vendors post-petition for pre-petition invoices, etc.  To some extent, this is to be expected for the ongoing operations of a business in Chapter 11.  However, first-day motions exist for this very purpose – and Debtor has failed to obtain Court authorization for numerous post-petition disbursements.

54. For the reasons stated in the Committee's objection to the Payroll Motion, the Committee believes the Payroll Motion is without merit and should be denied. *See* Dkt. No. 99. Those issues aside, the Payroll Motion is emblematic of the Debtor's gross mismanagement of this Bankruptcy Case.

55. This Court should also find the lack of filing first day motions indicative of the need to appoint a trustee. Upon information and belief, and subject to the Debtor turning over its books and records for examination as requested by Committee, the Debtor likely has paid pre-petition vendor invoices, used cash collateral and utility suppliers to support its business needs, as well as paid insurance premiums. The Debtor's failure to file any first day motions seeking relief from this Court to satisfy such claims can be indicative only of the Debtor's incompetence or gross mismanagement of its operations – and its failure to abide by the bankruptcy process set out under applicable law.

**v.      *The Plan Fails to Provide Any Value as to Avoidance Actions, Including Over $3.5 Million in Preference Period Transfers, in addition to a Large Number of Avoidance Claims Arising from Unauthorized Post-Petition Transfers.***

56. Debtor listed roughly $2.3 Million in Preference Period Transfers in its Statement of Financial Affairs that exceed the statutory threshold. *See* Statement of Financial Affairs, Part 2, 3.1, *et al*.

57. However, Debtor has provided to the Committee certain Preference Period Account Statements that reveal $3,526,940.31 in transfers during the Preference Period that exceed the statutory threshold. *See* Exhibit A, Bates No. EC-000927-EC-000959.

58. Further, upon information and belief, a large number of Section 549 of the Bankruptcy Code actions are likely to exist in this case. "The purpose of section 549 is to allow the trustee to avoid those post-petition transfers which deplete the estate while providing limited

protection to transferees who deal with the debtor. Fraud by the debtor and, except with respect to purchasers of real property, good faith on the part of the transferee are irrelevant to the application of this section." 5 COLLIER ON BANKRUPTCY ¶ 549.02 (15th Ed. rev. 2005).

59.     It is black letter law that court authorization is required before distribution by Debtor of pre-petition claims or adequate protection payments. *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Miller Min., Inc.*, 219 B.R. 219, 224 (Bankr. N.D. Ohio 1998). Debtor's filed monthly operating statements reveal that Debtor has made post-petition payments on pre-petition wages as well as pre-petition vendor invoices, as well as to equipment lessees, etc. *See* Monthly Operating Reports of Debtor [Dkt. Nos. 26, 41, 46, 56].

60.     Debtor has wholly failed to provide for the Preference Period Transfers and unauthorized post-petition transfers (as well as additional Chapter 5 Avoidance Actions) in its Plan. While Debtor has failed to provide Committee with sufficient data to estimate the value of the Preferences or post-petition transfer claims, the Committee anticipates that the value to unsecured creditors from such transfers is significant.

61.     In fact, counsel to the Debtor concedes that the Debtor ran no analysis on the avoidance actions. *See* **Exhibit B**, Email dated July 28, 2021. Debtor's counsel's reasoning for not performing an analysis of avoidance actions undercuts common sense as the potential value of the avoidance actions (more than $3.5 Million) on their face is greater than the scheduled pool of unsecured creditors in this case. *See* Schedule A/B. Surely, such obvious facts certainly warrant investigation to fulfill the fiduciary duty the Debtor holds to its creditors.

62.     Debtor's failure to schedule the avoidance actions – and to provide no value to the same in the Plan belies its fiduciary duty to its creditors. Such failures are further evidence of cause for a Chapter 11 Trustee in this case.

vii. **Debtor Attempted to Push Through a Chapter 11 Plan Proposed in Bad Faith – and Grounded in False Statements.**

63.     When the Committee was appointed by the U.S. Trustee, the Disclosure Statement was approved, and the Plan and its associated deadlines were set.  In fact, the Plan objection deadline was set to expire within (2) weeks of the Committee's appointment.

64.     Prior to undersigned counsel's involvement, the Committee requested an extension as to the deadlines associated with the Plan. *See* Dkt. No. 57, Exhibit 1.   The Debtor denied the Committee's reasonable request.

65.     Within days of its selection to represent the Committee, undersigned counsel reached out to Debtor's counsel to express its concerns regarding the proposed Plan – and to request an extension as to the deadlines associated with the Plan.  Most importantly, the Committee pointed out to Debtor that (i) the proposed Plan violated the absolute priority rule, (ii) that the Committee could find no evidence in public filings of the alleged security interest of the Insider, and (iii) that the Committee had not yet had a chance to review the books and records of the Debtor. The Committee understood that it would need to work with Debtor to consensually present a confirmable Plan.  Instead, Debtor denied the Committee's reasonable request and indicated that it intended to move forward with the Plan. *See* Dkt. No. 57, Exhibit 2.

66.     In the face of these concerns, the Debtor attempted to push through its Plan – and objected to the Committee's emergency motion to extend the deadlines associated with the Plan. *See* Dkt. No. 57, 63.

67.     After the Committee's review of the Plan – it became clear that the Debtor intended to push through a Plan that was proposed in bad faith and only served to benefit equity at the expense of Debtor's unsecured creditors.

17

68. Under Bankruptcy Code section 1129(a)(3), a Chapter 11 plan may only be confirmed if it has been "proposed in good faith and not by any means forbidden by law." The Debtor's Plan plainly fails to meet this standard.

69. "Good faith" is not defined by the Bankruptcy Code, but courts have found that "the term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objective and purposes of the Bankruptcy Code." *In re Weber*, 209 B.R. 793, 797 (D. Mass. 1994). The good faith standard requires that the Plan be proposed with good intentions to obtain a result that is consistent with the objectives and the purposes of the Bankruptcy Code. *See In re PWS Holding Corp.*, 228 F. 3d 224, 243 (3rd Circ. 2000) ("For purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986))); *see also In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004) ("At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy . . . .").

70. Whether the good-faith requirement is established is a fact intensive inquiry based on the totality of the facts and circumstances" that affords considerable discretion to the Court. *See In re W.R. Grace & Co.*, 475 B.R. 34, 88 (D. Del. 2012). Indeed, "failure of a debtor to use the full reach of its disposable resources to repay creditors is evidence that a plan is not proposed in good faith because such conduct frustrates this objective." *In re Walker*, 165 B.R. 994, 1001 (E.D. Va. 1994); *see also In re Shelton*, 370 B.R. 861, 867 (Bankr. N.D. Ga. 2007) ("a plan that proposes to pay 0% to creditors when a debtor could pay substantially more is not a plan proposed

18

in good faith"); *In re Edmunds*, 350 B.R. 636, 649 (Bankr. D.S.C. 2006) ("[s]ince it appears from Debtors' respective Schedules I and J that they have sufficient projected disposable income to pay a greater distribution to general unsecured creditors than proposed in their current plans … Debtors' present plans were therefore not proposed in good faith").

71.     Moreover, a Plan is not proposed in good faith if the Plan and underlying Schedules are based on fraudulent or inaccurate information.  *See In re Multiut Corp.*, 449 B.R. 323, 343 (Bankr. N.D. Ill. 2011).

72.     As discussed in Section II, the Debtor's underlying Schedules and assertions regarding the cash on hand and the Priority Wage Claim are inaccurate – and fail to account for at least $1.4 Million that would be available for distribution to unsecured creditors.  Debtor also asserts a $9.5 Million Alleged Secured Debt Claim for Owner for which $8.4 Million is completely unsupported in its own books and records.  Further, Debtor's Plan fails to account for Preferences, potentially worth $3.5 Million Dollars.

73.     Moreover, the Plan violates the absolute priority rule.  *See* Plan, Art. V.B.

74.     Pursuant to Section 1129(b)(2)(B)(ii) of the Bankruptcy Code, no holder of a claim or interest that is junior to another cram down claim shall receive any distribution on account of such junior claim or interest until the cram down classes are satisfied in full.  *In re ADPT DFW Holdings LLC*, 577 B.R. 232, 250–51 (Bankr. N.D. Tex. 2017).  In other words, according to the absolute priority rule, senior interests are entitled to full satisfaction before any return may be provided for junior interests.  *In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006).

75.     Pursuant to Debtor's Plan, Class 5 (Allowed Insider Claims) will receive no distribution and are impaired and deemed to reject the Plan.  *See* Plan, Art. V.B.  Pursuant to Debtor's Plan, Class 4 (General Unsecured Claims) will receive a ten percent (10%) pro rata distribution.  *See* Plan, Art. V.B.  Equity Interests are making no new consideration contribution in conjunction with the Plan. *See generally* Plan.

76.     Debtor's Plan falls well short of any indicia of good faith.  The evidence shows that Debtor has overinflated secured debt by $8.4 Million (or more), and fails to account for millions of dollars of valuable estate assets that are apparently unencumbered (or can be unencumbered through an avoidance action) and available to distribution to unsecured creditors.  This Plan fails to comport with the purpose of the Bankruptcy Code and is therefore not proposed in good faith under Section 1129(a)(3).  *See Multiut Corp.*, 449 B.R. at 343 ("The Plan's failure to adequately reserve claims and causes of action the Debtor may have against third parties, the failure to accurately state the value of unsecured claims, and the substantially inaccurate calculation of the Plan's minimum percentage distribution to unsecured creditors demonstrate to the Court that the Plan has not been proposed in good faith.")

77.     In the face of above facts, Debtor continues to press this Plan – a Plan that overstates secured debt in the amount of $8.4 Million – and while paying unsecured creditors only ten (10) cents on the dollar – restores full equity to the current ownership group. *See* Plan, Art. V.B. Debtor's bald attempts to push through the Plan that was filed only for the benefits of its equity to the detriment of its unsecured creditors is further evidence of the need for an appointment of a trustee pursuant to 11 U.S.C. § 1104(a)(1).

**viii.     *Debtor's Acrimonious Relationship with the Committee Warrants the Appointment of a Trustee.***

78.     The Debtor's acrimonious relationship with the Committee serves as fifth basis for the appointment of a trustee in this Bankruptcy Case. As indicated above, an acrimonious relationship between the debtor and one or more of its creditors may rise to the level of "cause" requiring the appointment of a trustee. *See, e.g., In re Marvel Entm't Group, Inc.*, 140 F.3d at 474.

79.     Here, the Committee believes that the appointment of a trustee is necessary so that a third-party can mediate disputes between the debtor and its creditors. *See In re The Bible Speaks*, 74 B.R. at 512.

80.     By way of example of this acrimonious relationship, the Court need not look further than the *Debtor's Emergency Motion for Order Enjoining Counsel for the Unsecured Creditors' Committee from Engaging in Negative Solicitation as to Debtor's Plan and Other Relief* [Dkt. No. 81] (the "Motion to Enjoin").

81.     In the Motion to Enjoin, the Debtor requested, among other things, that this Court enter sanctions under Bankruptcy Rule 9011 for Committee's counsel alleged improper solicitation of votes rejecting the Plan when the Committee simply emailed its constituency with its recommendation concerning the Plan. [*See* Dkt. No 81, ¶ 9].

82.     Moreover, Debtor has (i) refused to grant the Committee a routine extension of deadlines related to the Plan (the Committee having been appointed only two (2) weeks prior to the Plan objection deadline) [Dkt. No. 63]; (ii) objected to Committee Counsel's retention [Dkt. No. 75], and (iii) failed to provide the Committee was information regarding its books and records and then objected to the 2004 Motion the Committee was forced to file [Dkt. No. 87].

83.     Although other examples of animosity between the parties exist, they have been excluded here for the sake of brevity.  The Committee is of the opinion that the only option for

moving the plan process forward to resolution is the appointment of a trustee to act as a mediator between the Debtor and the Committee.

84. For the foregoing reasons, this Court should authorize the appointment of a trustee pursuant to 11 U.S.C. § 1104(a)(1).

**B.      Appointment of a Chapter 11 Trustee is in the Best Interest of Creditors.**

85. The appointment of a Chapter 11 Trustee is also appropriate under the best interest of creditor's test set forth in section 1104(a)(2). As noted in *Keeley*, one of the key considerations in determining whether to appoint a Chapter 11 trustee is "the benefits derived by appointment of a trustee, balanced against the costs of appointment." *See Keeley,* 455 B.R. at 164–65. In that case, the Eight Circuit BAP reviewed the appointment of a Chapter 11 trustee in an involuntary matter. *See id*. at 155. On review, the Eight Circuit BAP found that the interests of both creditors and the bankruptcy estate warranted appointment of a trustee because of questions about the ability of the Debtor's principal to move through the Chapter 11 process promptly and properly, issues about the trustworthiness of the Debtor's principals, and the general lack of confidence among parties-in-interest in the Debtor's case about the Debtor's ability to get through the plan process. *See id*. at 165. As a result, the Eight Circuit BAP upheld the Court below, stating that "we recognize that the appointment of a trustee involves costs, but the evidence suggests that the benefits from the appointment outweigh the costs in this case." *See id*.

86. In the same vein, the court in *Petit* found that a debtor's fiduciary role comprises an obligation to make forthright disclosure to the court and creditors and that a failure to disclose material and relevant information mandated appointment of a Chapter 11 trustee. *See Petit v. New England Mortg. Services Inc*., 182 B.R. 64, 69–70 (D. Me. 1995). The *Petit* court also agreed that "the need for a neutral party to mediate disputes between the debtor and its creditors

is ground for a trustee's appointment" and stated that "the appointment of a trustee may be the only way that the bankruptcy court can ensure that reorganization will proceed." *See id.* at 70. Moreover, the court in *Petit* rejected the debtor's argument that the court should not appoint a trustee because of the cost on grounds that the total cost to the estate would be more without a trustee than with a trustee. *See id*. at 71.

87.     Here, as stated above, issues exist about the sufficiency of the Debtor's disclosures surrounding certain claims identified in the Debtor's Schedules, and the continued lack of information and disclosure only underscores the need for the appointment of a trustee.

88.     While the Debtor has made some disclosures in response to the 2004 Motion and the Committee's informal document requests, such disclosures are less than adequate to surmise the validity of the Priority Wage Claim and Alleged Secured Claim, among other assets (avoidance actions) and debts (the PPP Loan, etc.).

89.     Furthermore, as detailed above, the Debtor's proposed Plan reflects that the Plan was proposed in bad faith and in order maximize the recovery to Debtor's Owner, while paying little to Debtor's general unsecured creditors.

90.     For the foregoing reasons, the Committee believes the appointment of a trustee is in the best interest of the Debtor's creditors pursuant to 11 U.S.C. § 1104(a)(2).

**WHEREFORE**, the Committee respectfully requests that this Court appoint a Chapter 11 trustee to oversee the administration of Debtor's Bankruptcy Case under 11 U.S.C. § 1104(a), and requests such further relief as this Court deems just and proper.

Dated: October 8, 2021.

Respectfully Submitted,

**HUSCH BLACKWELL LLP**

By:      */s/ Caleb T. Holzaepfel*
Buffey E. Klein
Texas State Bar No. 24032515
1900 N. Pearl, Suite 1800
Dallas, TX 75201
(214) 999-6100
(214) 999-6170 (fax)
buffey.klein@huschblackwell.com

Caleb T. Holzaepfel (admitted *pro hac vice*)
736 Georgia Avenue, Suite 300
Chattanooga, TN 37402
(423) 266-5500
(423) 266-5499 (fax)
caleb.holzaepfel@huschblackwell.com

**COUNSEL FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ELECTROTEK CORPORATION.**

## CERTIFICATE OF NON-CONFERENCE

Given the nature of the relief requested, the Committee did not confer with Debtor.  The Committee believes this relief requested in this Motion will be opposed and no reasonable chance of agreement exists.

/s/ *Buffey E. Klein*
Buffey E. Klein

## **<u>CERTIFICATE OF SERVICE</u>**

This will certify that a true and correct copy of the foregoing pleading has been forwarded via this Court's CM/ECF notification system to the parties registered for such service on October 8, 2021.

/s/ *Caleb T. Holzaepfel*
Caleb T. Holzaepfel